DOCKETED

JAN 1 0 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. REAVA KING, | ) ) ) | JUDGE KENNELLY |
| Relator/Plaintiffs, | ) ) ) | MAGISTRATE JUDGE DENLOW |
| v. | ) ) ) | 00C 3877 |
|  | ) ) | Civil Action No.: |
| F.E. MORAN, INC.; ARMON, INC.; THERMODYNE MECHANICAL SERVICES INC.; F.E. MORAN FIRE PROTECTION INC.; F.E. MORAN INC., SPECIAL HAZARD SYSTEMS; FIRE PROTECTION INDUSTRIES INC.; JADCO RESEARCH & ENGINEERING, INC.; and ARNOLD JACKSON, | ) ) ) ) ) ) ) ) ) ) | Filed In Camera and Under Seal Pursuant to 31 U.S.C. §3730(b)(2)  JURY TRIAL DEMANDED  FILED |
| Defendants. | ) ) | JUN 2 6 2000 |

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS, HOSTILE WORK ENVIRONMENT, AND CONSTRUCTIVE DISCHARGE

### Introduction

1.     Reava King ("relator/plaintiff") brings this action on her own behalf and on behalf of the United States of America for treble damages, civil penalties, and other relief arising from defendants F.E. Moran, Inc. ("Moran") and certain of its corporate affiliates' false claims made in violation of 31 U.S.C. §3729, et seq. Defendant F.E. Moran, Inc. is a federal contractor that receives millions of dollars in revenues from federal contracts each year. Moran and defendant Jadco Research & Engineering, Inc. ("Jadco") have repeatedly, knowingly and willfully presented to the United States government and/or its agents false claims for payments on federal contracts by falsely representing that they complied with the

terms of various federal contracts, as set forth in 15 U.S.C. §637(d) and accompanying federal regulations.

2.     The violations arise out of Moran's knowingly false representations that it would use defendant Jadco, a minority-owned company, as a major subcontractor on federally funded contracts received by Moran when in fact Jadco was used merely as a "pass-through" company for transactions between Moran and other non-disadvantaged white-owned companies, including Moran's corporate affiliates defendants Thermodyne Mechanical Services Inc. and F.E. Moran Fire Protection Inc. These white-owned companies would serve as the actual subcontractors with Moran while Jadco, which would provide no actual goods or services in connection with these subcontracts, would receive a 2-3% fee on each purchase order in exchange for its participation in this scheme.

3.     These false representations enabled Moran to bid for and receive lucrative federal contracts from the United States government while evading its statutory and contractual duty to design and implement in good faith a plan to utilize minority-owned and other disadvantaged small businesses as subcontractors. In addition, Moran's false representations regarding its usage of the minority-owned Jadco as a subcontractor enabled it to gain a competitive advantage in the bidding process that it would not have had if it had truthfully represented that it was going to use non-disadvantaged white-owned companies as its subcontractors when it bid for the contracts.

4.     Relator/plaintiff King gained first hand knowledge of the dealings between Moran and Jadco as well as Moran's attitude regarding the usage of minority-owned firms during her employment by Moran as an estimating support person and later as Moran's EEO

2

compliance officer. Throughout her employment, King prepared the purchase orders of Moran, Jadco, and on occasion, those of some of Moran's corporate affiliates.

5.     When King realized that Jadco was functioning as a sham with respect to its alleged participation as a subcontractor in federally funded contracts, she confronted the president of Armon, Inc. ("Armon"), the parent corporation that wholly owns Moran, regarding the matter. King asserted that Jadco was a sham and that Moran's use of Jadco as a purported subcontractor on Moran's federal contracts was illegal. Armon's President, while acknowledging that Jadco was a sham, insisted that King continue to process Jadco's paperwork as a condition of her continuing her employment with Moran. King was thereby constructively discharged in violation of 31 U.S.C. §3730(h).

6.     While employed by Moran, King worked at the corporate headquarters of Moran and its corporate affiliates. Defendants' personnel, including the President of defendant Thermodyne, subjected King to a hostile working environment based on her sex and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., and 42 U.S.C. §1981.

## Jurisdiction and Venue

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and 42 U.S.C. §2000e-5(f).

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a).

3

## Parties

### Plaintiffs

9.    The United States Government is the plaintiff on whose behalf the relator Reava King brings this action under 31 U.S.C. §3729 et seq. The United States government through its various agencies/departments, including the U.S. Postal Service, the General Services Administration, the U.S. Department of Labor, and the Department of Health and Human Services, funded (in whole or in part) the contracts against which various defendants submitted their false claims.

10.    Relator/plaintiff Reava King is a United States citizen and resident of Chicago, Illinois. King was hired by defendant F.E. Moran, Inc. on or about June 17, 1998 to serve as an estimating support person. On or about April 6, 1999, Moran named King as its EEO Officer. King's employment with Moran ended on February 16, 2000.

11.    Relator King has direct knowledge of the allegations underlying this complaint, she has brought the information underlying this complaint to the attention of the government, and she is the original source of the information brought to the government.

### Defendants

12.    Defendant F.E. Moran, Inc. ("Moran") is an Illinois for-profit corporation headquartered at 2265 Carlson Drive, Northbrook, Illinois 60062. Moran is a federal contractor that specializes in heating, air conditioning, refrigeration, ventilation, and plumbing work. Moran has annual sales of approximately thirty-eight million dollars and a net worth of more than 5.6 million dollars.

13.    Defendant Thermodyne Mechanical Services Inc. ("Thermodyne") is an Illinois

4

for-profit corporation headquartered at 2283 Carlson Drive, Northbrook, Illinois 60062.
Thermodyne specializes in heating and air conditioning repair.

14. Defendant F.E. Moran Fire Protection Inc. ("Moran Fire Protection") is an
Illinois for-profit corporation headquartered at 2265 Carlson Drive, Northbrook, Illinois
60062. Moran Fire Protection installs automatic fire sprinkler systems.

15. Defendant F.E. Moran Inc., Special Hazard Systems ("Moran Special
Hazards") is an Illinois for-profit corporation headquartered at 2265 Carlson Drive,
Northbrook, Illinois 60062. Moran Special Hazards specializes in industrial fire protection
installation.

16. Defendant Fire Protection Industries Inc. ("Fire Protection") is an Illinois for-
profit corporation headquartered at 2265 Carlson Drive, Northbrook, Illinois 60062. Fire
Protection specializes in the installation and service of fire suppression systems and it also
distributes sprinkler system products.

17. Defendant Armon, Inc. ("Armon") is a Delaware for-profit corporation
headquartered at 2265 Carlson Drive, Northbrook, Illinois 60062. Armon operates as a
holding company for Moran, Thermodyne, Moran Fire Protection, Moran Special Hazards,
and Fire Protection ("the Armon Group"). Armon owns one hundred percent of the capital
stock of Moran, Moran Fire Protection, Moran Special Hazards, and Fire Protection and it
owns eighty percent of the capital stock of Thermodyne. Between two and four Armon
officers serve as officers for each member of the Armon Group.

18. Armon is a federal contractor. Through the Armon Group, Moran operates as
a subcontractor for contracts involving heating, ventilation, air conditioning, plumbing,

5

automatic sprinkler and fire protection, and refrigeration work.

19. During the relevant time, the Presidents of defendants Moran, Thermodyne, Moran Special Hazard, Moran Fire, and Fire Protection reported to John Puder, the President of Armon.

20. Armon and its subsidiaries Moran, Thermodyne, Moran Special Hazard, Moran Fire, and Fire Protection have annual sales of approximately seventy million dollars and a net worth of over 8.3 million dollars.

21. Jadco Research & Engineering, Inc. is an Illinois for-profit corporation headquartered at 4006 North Nashville Avenue, Chicago, Illinois 60634. Jadco holds itself out as operating four divisions: a construction division (which does mechanical, piping, roofing, black topping construction, and supplies labor to contractors); an engineering division; a power division (which provides maintenance to electrical power plants; and a temporary manpower division (which provides emergency support help to engineering firms). Jadco holds itself out as having approximately twenty-two employees.

22. Jadco has been identified itself as a Native American-owned small business on a website connected with the U.S. Small Business Administration. Jadco has been certified as a minority owned business by the various governmental entities including the Illinois Department of Transportation, Metra, Cook County, and the City of Chicago.

23. Jadco has estimated annual sales of 1.5 million dollars.

24. Defendant Arnold Jackson is a United states citizen and resident of the State of Illinois. Jackson, who is a member of a racial minority group (Native American), is Jadco's President. Jackson owns ninety-nine percent of Jadco's capital stock.

6

### King's Initial Position At Moran

25.     Defendant Moran hired King on or about June 17, 1998 to serve as an estimating support person.  Prior to her employment at Moran, King had twelve years of project and contract management experience.

26.     As an estimating support person, King was responsible for, <u>inter alia</u>, completing a substantial portion of Moran's purchase orders as well as the purchase orders for defendant Jadco Research & Engineering, Inc.  On occasion, King completed purchase orders for defendants Thermodyne and Moran Fire Protection.

27.     In addition, King would send out invitations to businesses so that they could prepare pricing estimates and receive consideration to get awarded contracts to serve as Moran subcontractors and suppliers.  King would also ascertain unit prices for materials required for various projects, get information on delivery timetables, and perform various other administrative duties.

28.     King reported directly to Moran's Operations Vice-President and she responded to requests by Moran's project managers and subcontractors.

29.     King, at Moran's urging, became a notary public and she was required to notarize documents concerning Moran and Jadco and other Moran affiliates during the course of her employment.

### Obligations Imposed On Federal Contractors

30.     The federal government has mandated through the Small Business Act ("Act") that small businesses owned by persons who are economically and socially disadvantaged

> shall have the maximum practical opportunity to participate in the performance
> of contracts let by any Federal agency, including contracts and subcontracts

for subsytems, assemblies, components, and related services for major systems.

15 U.S.C. §637(d)(1).

31.     Members of certain racial and ethnic groups, including Native Americans, Hispanic American, and African-Americans, are presumed to be economically and socially disadvantaged for purposes of the Small Business Act.

32.     Under the Act, a bidder for a federal construction contract in excess of one million dollars must negotiate with the federal procurement authority a subcontracting plan for the utilization of socially and economically disadvantaged small businesses.  15 U.S.C. §637(d)(4)(A).  Among other things, such a subcontracting plan must include percentage goals for the utilization as subcontractors of small business concerns owned and controlled by socially and economically disadvantaged persons and assurances that the bidder will make periodic reports regarding its compliance with the plan.  15 U.S.C. §637(d)(6).  The failure to negotiate such a plan renders the bidder ineligible to receive the contract.  15 U.S.C. §637(d)(4)(C).

33.     A subcontracting plan is a "material part of the contract" and a successful bidder's failure to comply in good faith with the plan is a "material breach" of the contract. 15 U.S.C. §§637(d)(4)(B); 637(d)(5)(B); 637 (d)(8).

34.     A bidder will not receive a federal construction contract in excess of one million dollars unless the procurement authority determines that the bidder's subcontracting plan provided "the maximum practicable opportunity" for disadvantage small businesses to participate in the performance of the contract.  15 U.S.C. §637(d)(4)(D).

35.     Procurement officers for individual federal agencies consider as a factor in

8

evaluating bids for federal contracts the degree to which small minority and female owned businesses are participating as subcontractors. Price evaluation adjustments and/or monetary incentives clauses may be used by procurement officers to encourage contractors to provide small, disadvantaged businesses with the maximum practicable opportunity to participate as subcontractors in contracts issued by federal agencies. Federal Acquisition System, Part 19, 48 C.F.R. 19.201(b).

36.   Procurement officers are authorized to encourage the development of increased subcontracting opportunities by providing monetary incentives such as payments based on actual subcontracting achievement or award-fee contracting.

37.   Federal contractors are required to submit extensive reports regarding their use of small minority and women owned subcontractors on final contracts. The submission of such reports is required by the terms and conditions of the federal contracts.

38.   Because of these and other federal requirements, a bidder who represents that it will substantially involve small minority-owned businesses as subcontractors in its performance of a federal contract has a significant competitive advantage over a bidder who represents that it will use only non-disadvantaged white-owned businesses in the performance of the contract.

## Defendants' Fraudulent Scheme

39.   Defendants Moran and Armon are federal contractors that may bid on and receive awards of federally funded contracts.

40.   As of October, 1999, Moran was a contracting party on at least eleven on-going federally funded or federally assisted projects ("federal projects"). In the two years

preceding that time, Moran was a contracting party on at least nine other federal projects. Some of Moran's contracts have a value in excess of one million dollars. Moran would serve as either a general contractor or as a subcontractor on these federal projects.

41.     As a contracting party on these federal projects, Moran is subject to equal employment and affirmative action requirements imposed by the federal government.

42.     Defendants engaged in the following fraudulent scheme to obtain federal contracts.

43.     On a frequent (typically weekly) basis, Moran issues to its preferred suppliers and subcontractors bid schedules that describe work that Moran intends to bid on and the subcontracting and/or supplying opportunities that might be available.

44.     These preferred suppliers and subcontractors (all of whom are non-disadvantaged white-owned businesses) then engage in the activities that are needed to prepare estimates for the costs of the work or materials. These businesses, for example, examine the drawings or blueprints for the job, walk the job site where appropriate, and -- based on the information furnished by Moran and/or the owner of the property -- submit estimates to Moran regarding the price of the work Moran expects to subcontract or the price of materials to be supplied.

45.     If Moran's bid is accepted and it receives the federal contract, the estimates given by Moran's preferred suppliers and subcontractors provide the "actual price" of the materials to be supplied and/or of the work to be subcontracted.

46.     Based on their awareness of federal affirmative action requirements and on the competitive advantage that minority subcontractor participation would offer in the federal

contracting process, Moran and Jadco represented that Jadco, a small Native American-owned business, was receiving substantial work as a subcontractor on Moran's federal contracts when in fact Jadco was serving as a "pass through" company on these jobs.

47.    Jadco performed no actual subcontracting work and it supplied no materials in connection with these federal projects.  Moran's preferred non-disadvantaged white-owned subcontractors and suppliers would actually perform the work and provide the materials in question.  These white-owned companies would provide to Moran documentation (e.g., packing lists and certified payrolls) indicating that they actually performed the work and/or supplied the materials.  Jadco did not submit any such paperwork.  Nor did Jadco engage in any of the preliminary steps (such as examining blueprints or walking the job sites) necessary to prepare estimated prices.

48.    Jadco received a fee of two to three percent of the value of each subcontract that it was represented to perform or of the value of the materials that it was represented to supply.  Jadco performed no commercially useful function in connection with the federal contracts and projects in question.

49.    Moran and Jadco took several steps to fraudulently represent Jadco's role with respect to these federal contracts and to conceal the true nature of Jadco's actual involvement.

50.    Moran would represent that Jadco was to serve subcontractor in its bids and other documentation that it submitted to receive federal contracts.  For example, plaintiff/relator King observed a Moran bid for work on the federal project at the Fisher Building that listed Jadco as a subcontractor.  In another example, on or about March 13,

11

1998, Moran submitted a "MBE/WBE Utilization Plan" in connection with the Oriental Theater Restoration federal project in which it represented that Jadco would receive 27.3% (or $600,000) of Moran's 2.2 million dollar contract.

51.    Moran would execute dual sets of purchase orders in connection with each subcontract where Jadco was involved.  One set of purchase orders would be issued from Moran to Jadco with a price reflecting the actual value of subcontracted work or materials to be supplied plus Jadco's 2 to 3% fee.  The second set of purchase orders would be written on Jadco letterhead and sent directly by Moran to one of Moran's preferred non-disadvantaged white-owned companies for the actual value of the subcontracted work or materials to be supplied.

52.    Illustrative examples of Moran's preparation of dual sets of purchase orders regarding the same subcontracting work or materials include:

(a) purchase orders dated on or about February 19, 1999 in connection with the federal project at the Good Samaritan Wellness Center which reflect that Moran issued one purchase order to Jadco and that Jadco (through Moran as in all of the following examples) issued a second purchase order to Johnson Controls; purchase orders dated on or about October 26, 1998 from Moran to Jadco and then from Jadco to Synergy Insulations; purchase orders dated on or about October 26, 1998 from Moran to Jadco and then from Jadco to Trane Air Co.; purchase orders dated on or about April 19, 1999 from Moran to Jadco and then from Jadco to Trane Air Co.; purchase orders dated on or about October 26, 1998 from Moran to Jadco and then from Jadco to Trane Air Co.;

(b) purchase orders dated July 19, 1999 in connection with the federal project at the

12

Palace Theater which reflect that Moran issued one purchase order to Jadco and that Jadco issued a second purchase order to Air Products; purchase orders dated July 15, 1999 in connection with the federal project at the Palace Theater which reflect that Moran issued one purchase order to Jadco and that Jadco issued a second purchase order to Carrier Corp.; a set of purchase orders dated April 20, 1999 in connection with the federal project at the Palace Theater which reflect that Moran issued purchase orders to Jadco and that Jadco issued a second set of purchase orders to defendant Thermodyne; a set of purchase orders dated October 13, 1999 in connection with the federal project at the Palace Theater which reflect that Moran issued purchase orders to Jadco and that Jadco issued a second set of purchase orders to BBM Engineering; a change order issued on or about January 5, 2000 to Jadco and a second change order issued to Control Solutions; and

(c) purchase orders dated on or about July 21, 1999 in connection with the federal project at the One North Dearborn which reflect that Moran issued one purchase order to Jadco and that Jadco issued a second purchase order to Trane Co.

53. Moran and Jadco executed purchase orders reflecting Jadco's negotiation of an increase of his "pass through" fee from 2% to 2.5% in or about September 9, 1999 in connection with the federal project at the Fisher Building.

54. Moran would actually complete the purchase orders that Jadco was purportedly issuing to third parties. To facilitate this process, defendant Jackson (Jadco's President) would bring to Moran blank purchase orders and sign them in the presence of King. Moran would then complete these purchase orders and send them to the actual subcontractors and suppliers.

13

55.     Moran prepared a Jadco log-book which lists by project and purchase order number a portion of the numerous transactions between 1991 and 1998 where Jadco served as a "pass through" company for non-disadvantaged white-owned firms.  This log-book (which also lists the actual subcontractors and/or suppliers used by Moran) provides further documentation that Jadco was involved in the federal projects at University of Illinois at Chicago, the Chicago Job Corps, Oriental Theater, and Good Samaritan Hospital.

56.     Shortly after she was hired by Moran, King was ordered to prepare and send Moran and Jadco purchase orders such as the ones referenced above.  Because she occasionally prepared purchase orders on behalf of Armon's subsidiaries (such as defendant Thermodyne) and no one at Moran raised any questions regarding Jadco, King prepared Jadco's purchase orders based on the assumption that Jadco was another Armon subsidiary.

57.     King eventually realized that Jadco was a separate corporation and that it was performing no actual subcontracting work.

58.     On February 16, 2000, King went to the office of John Puder, the President of Armon.  King told Puder that she believed that Jadco was operating as a sham with respect to its alleged participation as a subcontractor with Moran's federal contracts.  She also told Puder that she believed Moran's dealing with Jadco (namely, Moran's representations to federal government officials and agents as to its purported utilization of Jadco as a subcontractor) were illegal and that she was no longer willing to process Jadco purchaser orders or involve herself in any fashion with work involving Jadco.

59.     Puder became angry, loudly cursed at King, and called her a bitch.  He admitted that Jadco was a sham, but indicated that Moran's dealings with Jadco were the way

that business was done. Puder indicated that King could stop her EEO outreach and compliance work. However, Puder emphatically told King that it was not an option for King to stop doing the Jadco work.

60.     Armon, through its President Puder, thereby ratified the actions of Moran, Thermodyne, Jadco, and Jackson.

61.     King left Puder's office. Unwilling to engage in the illegal, fraudulent actions involving Jadco, King gathered her personnel effects, left the building, and never returned to Moran.

### The Conditions of King's Employment

62.     During her tenure at Moran, King worked at Moran's corporate headquarters in Northbrook. Defendants Armon, F.E. Moran Fire Protection, F.E. Moran Special Hazards, Thermodyne, and Fire Protection also officed their headquarters staff within this same building ("the Corporate Headquarters").

63.     More than one hundred employees worked at the Corporate Headquarters during plaintiff's employment. Plaintiff was the only African-American employed at the Corporate Headquarters with the exception of a brief period in which Moran employed one other African-American women. No more than ten women were employed at the Corporate Headquarters.

64.     Moran has had a history of non-compliance with the affirmative action requirements applicable to it as a federal contractor.

65.     In 1982, the Office of Federal Contract Compliance Programs ("OFCCP") asserted that Moran had failed to make good faith efforts to recruit and hire a sufficient

number of minority and female workers in those trades (e.g., pipefitting, sprinkler-fitting, plumbing, and sheet-metal working) that Moran regularly employs.

66.    In 1993, OFCCP asserted that Moran violated the federal requirements stemming from Executive Order 12246 by, among other things, failing to (a) make good faith efforts to hire women and minorities as part of its union workforce; (b) advertise employment opportunities or direct its recruitment efforts toward minorities and women; (c) disseminate its EEO policies to unions and training programs; and (d) periodically review its performance with respect to EEO policies and affirmative action obligations.  Moran subsequently entered into a Conciliation Agreement with OFFCP which provided that Moran would remedy these violations as long as it was a government contractor and that Moran would provide OFFCP with semi-annual reports on its progress.

67.    In or about March 1999, Moran received notice that OFFCP was going to conduct an audit of its equal employment practices.

68.    On or about April 6, 1999, Moran named King as its EEO Officer.  King continued to perform the above described estimating duties even after she became Moran's EEO Officer.

69.    As EEO Officer, King was ordered to help Moran comply with the affirmative action requirements applicable to federal contractors.  Among other things, King was assigned to meet with the Office of Federal Contract Compliance.

70.    After King met with the Office of Federal Contract Compliance, the Office agreed to postpone its noticed audit of Moran for one and one-half years to give Moran an opportunity to address the EEO issues that concerned the Office.

71.     King attempted to expand Moran's outreach efforts to minority-owned businesses that could serve as subcontractors.

72.     John Puder, Armon's President, refused King's request that Moran join the Black Contractors United ("BCU") because Moran's Vice President had had a confrontation with some African-Americans at a work site and Puder did not feel that Moran could work with the BCU.

73.     Moran's personnel did not fully pursue the outreach efforts that King recommended.

74.     Moran undermined King's efforts to increase outreach to minority-owned businesses by, among other things, canceling appointments that she had made so that minority-owned vendors could visit Moran's worksites and prepare bids for work.  Moran also suggested that King  perform receptionist duties which would have interfered with her EEO responsibilities.

75.     Despite King's efforts, neither Moran nor its corporate affiliates increased their utilization of minority-owned subcontractors during King's tenure at the company.

76.     Defendant Thermodyne's President Bert Miedler and other personnel employed by defendants at the Corporate Headquarters subjected King to a hostile working environment based on her sex and race.

77.     Comments and conduct which created the hostile environment include, but are not limited to:

a.     President Miedler's use of the term "nigger" within the Corporate Headquarters and his making derogatory comments about the predominately African-

17

American "south side" of Chicago where King resides;

      b.      men commenting on the bodies and physical characteristics of King and other women;

      c.      men referring to women as "girls" and with offensive terminology and making other sexually inappropriate comments;

      d.      men sending inappropriate and sexually offensive e-mails to King;

      e.      men making offensive jokes about women, African-Americans, and other racial groups;

      f.      President Miedler's statements at a company party for Moran's President that barbecued ribs, fried chicken, and watermelon were King's favorite foods and his usage at this same party of the terms "niggers" and "spics" when referring to African-American and Latinos;

      g.      men leering at King's body;

      h.      men questioning King on her sex life;

      i.      employees' subjecting King to racially charged statements, e.g., "you're cute for a black girl," and their usage of stereotypical African-American expressions when addressing King (but not white employees);

      j.      men posting calendars of women in scantily clad outfits;

      k.      President Miedler engaging in some inappropriate touching and in lewd and inappropriate gestures (e.g., scratching his private parts in front of King);

      l.      at a joint company golf outing for the Corporate Headquarters personnel of Armon, Moran, Thermodyne, Moran Special Hazards, Moran Fire Protection, and Fire

18

Protection, defendants hired a female stripper to entertain the men at one of the holes on the golf course.

78.     The offensive conduct alleged above was pervasive, severe, and objectively offensive. Furthermore, this offensive conduct caused King to suffer significant emotional distress and anxiety.

79.     King complained regarding the offensive conduct that she was subjected to. Moreover, the upper level management of defendants Armon, Moran, Thermodyne, Moran Special Hazard, Moran Fire Protection, and Fire Protection (including John Puder, who is the President of Armon, Moran Special Hazards, and Fire Protection) observed or were otherwise aware of the occurrence of much of the offensive conduct described above.

80.     Despite this, defendants neither stopped further offensive behavior from occurring, nor (to King's knowledge) disciplined anyone who engaged in it.

A

## COUNT I

### FALSE CLAIMS ACT VIOLATIONS (AGAINST DEFENDANTS MORAN, ARMON, THERMODYNE, JADCO, AND JACKSON)

81.     Plaintiff King realleges paragraphs 1-80 as paragraph 81 of Count I.

82.     In violation of 31 U.S.C. §3729(a)(1), defendants repeatedly, knowingly and willfully presented to officers, employees, and/or agents of the United States Government false claims to receive payments on federal construction contracts. Defendants have done so by falsely representing -- both in federal bids and contract compliance reports -- that they are utilizing a small minority-owned business (Jadco) to perform substantial work on contracts

that Moran received for work on federal projects when in fact Jadco merely served as a "pass-through" company for transactions between Moran and other non-disadvantaged white-owned companies.

83. In violation of 31 U.S.C. §3729(a)(2), defendants knowingly made, used, or caused to made or used, false records or statements to get false claims paid or approved by the United States Government.

84. In violation of 31 U.S.C. §3729(a)(3), defendants conspired to defraud the United States Government by getting false claims allowed or paid.

85. Defendants' false representations caused Moran to receive more favorable consideration from federal contracting officers and to receive contract awards for which it was in not in fact eligible. Defendants' false representations further permitted them to evade the federal statutory and regulatory requirements to make good faith efforts to utilize disadvantaged small businesses as subcontractors to the maximum extent practicable.

86. The United States Government reasonably relied on defendants' false statements, representations, receipts, records and other documentation and paid the false claims.

87. As a direct result of defendants' submission of false claims, the United States Government suffered actual damages in an amount to be proven at trial.

WHEREFORE, plaintiff/relator requests that this Court:

(1) Enter judgment for plaintiff/relator and against defendants;

(2) Award the United States Government three times the amount of the actual damages sustained by the government as a result of defendants' false statements and false

claims alleged in this complaint;

(3)  Assess civil penalties of $10,000.00 but not less than $5,000.00 against the defendants for each and every false claim submitted by the defendants to the United States government in connection with the false statements and false claims alleged in this complaint;

(5)  Award prejudgment interest;

(6)  Award plaintiff/relator statutory attorney's fees, costs, and expenses which she necessarily incurred in bringing and prosecuting this action;

(7)  Grant such other relief as the Court may deem just, necessary, and proper.

## COUNT II

### CONSTRUCTIVE DISCHARGE IN VIOLATION OF THE FALSE CLAIMS ACT (AGAINST DEFENDANTS MORAN, ARMON)

88.  Plaintiff King realleges paragraphs 1-87 as paragraphs 88 of Count II.

89.  By demanding that plaintiff/relator King engage in the illegal fraudulent scheme regarding Moran and Jadco as described above as a condition of her employment, defendants Armon and Moran harassed and constructively discharged King in violation of 31 U.S.C. §3730(h).

90.  As a direct result of defendant' wrongful acts in violation of 31 U.S.C. §3730(h), King has been injured in amount to be determined at trial.

WHEREFORE, plaintiff/relator requests that this Court:

(1)  Enter judgment for plaintiff/relator and against defendant;

(2)  Award to plaintiff/relator double backpay, interest on the backpay and

compensation for special damages including emotional distress that plaintiff/relator sustained as a result of defendants' unlawful conduct;

(3)     Award prejudgment interest;

(4)     Award plaintiff/relator statutory attorney's fees, costs, and expenses which she necessarily incurred in bringing and prosecuting this action;

(5)     Grant such other relief as the Court may deem just, necessary, and proper.

## COUNT III

### TITLE VII HOSTILE ENVIRONMENT CLAIM BASED ON SEX AND RACE (AGAINST DEFENDANT MORAN)

91.     Plaintiff King realleges paragraphs 1-90 as paragraph 91 of Count III.

92.     Moran was King's employer as that term is defined in Title VII, 42 U.S.C. §2000e(b).

93.     Plaintiff King filed with the Equal Employment Opportunity Commission ("EEOC") a timely charge of discrimination against Moran on or about February 22, 2000. King has received from the EEOC a right-to-sue letter and she filed this complaint within 90 days of receiving that right-to-sue letter.

94.     Moran, along with defendants Armon, Thermodyne, Moran Special Hazard, Moran Fire Protection, and Fire Protection, controlled the Corporate Headquarters and had a legal responsibility to keep the Corporate Headquarters free from discriminatory harassment.

95.     Moran negligently failed to take reasonable steps to control and prevent sexual and racial harassment by personnel working within the Corporate Headquarters.

22

96.     By allowing the creation of a hostile working environment based on sex and race and by failing to take effective remedial action to stop the offensive conduct, Moran violated King's rights under Title VII, 42 U.S.C. §2000e et seq.

WHEREFORE, plaintiff requests that this Court:

(1)     Enter judgment for plaintiff and against defendant;

(2)     Declare that the practices and actions of defendant complained of herein be adjudged, decreed, and declared to violate the rights of plaintiff King secured to her by Title VII;

(3)     Award compensatory damages in an amount to be determined at trial be awarded to plaintiff King and against defendant to compensate plaintiff King for her emotional distress, humiliation, and anguish caused by the unlawful conduct;

(4)     Award to plaintiff King punitive damages in an amount to be determined at trial;

(5)     Order defendant to pay prejudgment interest to plaintiff King on her damages;

(6)     Order defendant to pay to plaintiff King her reasonable attorney's fees, costs, and litigation expenses; and

(7)     Grant such other relief as the Court may deem just, necessary, and proper.

<u>COUNT IV</u>

42 U.S.C. §1981 HOSTILE ENVIRONMENT CLAIM BASED ON RACE
(AGAINST DEFENDANTS MORAN, ARMON, THERMODYNE, MORAN
<u>SPECIAL HAZARD, MORAN FIRE PROTECTION, AND FIRE PROTECTION)</u>

97.     Plaintiff King realleges paragraphs 1-96 as paragraph 97 of Count IV.

23

98.    Defendants Moran, Armon, Thermodyne, Moran Special Hazard, Moran Fire Protection, and Fire Protection controlled the Corporate Headquarters and had a legal responsibility to keep the Corporate Headquarters free from discriminatory harassment.

99.    Defendants Moran, Armon, Thermodyne, Moran Special Hazard, Moran Fire Protection, and Fire Protection negligently failed to take reasonable steps to control and prevent racial harassment by defendant Thermodyne's President Miedler and other personnel working within the Corporate Headquarters.

100.    By allowing the creation of a hostile working environment based on race and by failing to take effective remedial action to stop the offensive conduct, defendants Moran, Armon, Thermodyne, Moran Special Hazard, Moran Fire Protection, and Fire Protection violated King's rights under 42 U.S.C. §1981.

WHEREFORE, plaintiff requests that this Court:

(1)    Enter judgment for plaintiff and against defendants;

(2)    Declare that the practices and actions of defendants complained of herein be adjudged, decreed, and declared to violate the rights of plaintiff King secured to her by Section 1981;

(3)    Award compensatory damages in an amount to be determined at trial be awarded to plaintiff King and against defendants to compensate plaintiff King for her emotional distress, humiliation, and anguish caused by the unlawful conduct;

(4)    Award to plaintiff King punitive damages in an amount to be determined at trial;

(5)    Order defendants to pay prejudgment interest to plaintiff King on her damages;

24

(6)     Order defendants to pay to plaintiff King her reasonable attorney's fees, costs, and litigation expenses; and

(7)     Grant such other relief as the Court may deem just, necessary, and proper.

Respectfully submitted,

_____

Jeffrey I. Cummings, One of the
Attorneys for Relator/Plaintiff Reava King

Judson H. Miner
Jeffrey I. Cummings
John F. Belcaster
Barack Obama
MINER, BARNHILL & GALLAND, P.C.
14 West Erie Street
Chicago, IL  60610
(312) 751-1170

25

JS 44
(Rev. 07/86)

## CIVIL COVER SHEET

**DOCKETED**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

JAN 1 0 2001

(CAJ)

### I (a) PLAINTIFFS

JUDGE KENNELLY

UNITED STATES OF AMERICA ex rel.
REAVA KING,

MAGISTRATE JUDGE DENLOW

**DEFENDANTS**

F.E. MORAN, INC.; ARMON, INC.; TGERNIDTBE
MECHANICAL SERVICES, INC., F.E. MORAN FIRE
PROTECTIONM , INC.; F.E. MORAN INC SPECIAL
HAZARD SYSTEMS, FIRE PROTECTION INDUSTRIES

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Cook__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __Cook__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Miner, Barnhill & Galland
14 West Erie Street
Chicago, IL 60610

ATTORNEYS (IF KNOWN)

**FILED**

00C 3877

JUN 2 6 2000

### II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

☒ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of
Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

UNITED STATES DISTRICT COURT

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

### IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY) Cause of action for False Claims Act violations, hostile work environment, and constructive discharge pursuant to 28 U.S.C. Sec. 1331 and 1343(a)(3) and 42 U.S.C. Sec. 2000e-5(f)

### V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 690 Other | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 Habeas Corpus | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 540 Mandamus & Other | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 550 Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

### VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

Transferred from
☐ 5 another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to District
☐ 7 Judge from
Magistrate
Judgment

### VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

### VIII. REMARKS

In response to ☒ is not a refiling of a previously dismissed action
General Rule 2.21D(2) this case ☐ is a refiling of case number _____ of Judge _____

DATE
June 26, 2000

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

1-2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

JAN 1 0 2001

In the Matter of

UNITED STATES OF AMERICA, ex rel.
REAVA KING,

v.

F.E. MORAN, INC., et al.

**FILED**

JUN 2 6 2000

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

JUDGE KENNELLY

Case Number: **00C 3877**

MAGISTRATE JUDGE DENLOW

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff REAVA KING

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE | | |
| NAME Jeffrey I. Cummings | | | NAME Judson H. Miner | | |
| FIRM Miner, Barnhill & Galland | | | FIRM Miner, Barnhill & Galland | | |
| STREET ADDRESS 14 West Erie Street | | | STREET ADDRESS 14 West Erie Street | | |
| CITY/STATE/ZIP Chicago, IL 60610 | | | CITY/STATE/ZIP Chicago, IL 60610 | | |
| TELEPHONE NUMBER (312) 751-1170 | | | TELEPHONE NUMBER (312) 751-1170 | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6195523 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 10925237 | | |
| MEMBER OF TRIAL BAR? | YES X | NO ☐ | MEMBER OF TRIAL BAR? | YES X | NO ☐ |
| TRIAL ATTORNEY? | YES X | NO ☐ | TRIAL ATTORNEY? | YES X | NO ☐ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |
| (C) | | | (D) | | |
| SIGNATURE | | | SIGNATURE | | |
| NAME John F. Belcaster | | | NAME Barack Obama | | |
| FIRM Miner, Barnhill & Galland | | | FIRM Miner, Barnhill & Galland | | |
| STREET ADDRESS 14 West Erie Street | | | STREET ADDRESS 14 West Erie Street | | |
| CITY/STATE/ZIP Chicago, IL 60610 | | | CITY/STATE/ZIP Chicago, IL 60610 | | |
| TELEPHONE NUMBER (312) 751-1170 | | | TELEPHONE NUMBER (312) 751-1170 | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6209611 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES X | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |