# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3877 | **DATE** | 8/22/2002 |
| **CASE TITLE** | | King vs. F.E.Moran | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP4(a)(2).

(10) ■ [Other docket entry]   For the reasons set forth on the attached memorandum opinion and order, defendant's motion for summary judgment (71-1) is granted in part and denied in part, and plaintiff's motion for partial summary judgment (80-1) is denied.  King has until 8/30/02 to file an amended complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | **Document Number** |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 95 |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

AUG 2 9 2002

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. REAVA KING, | ) | |
|  | ) | |
| Relator/Plaintiff, | ) | |
|  | ) | |
| vs. | ) | Case No. 00 C 3877 |
|  | ) | |
| F.E. MORAN, INC. and ARMON, INC., | ) | |
|  | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case is before the Court on the parties' cross-motions for summary judgment on

plaintiff Reava King's claim that defendants F.E. Moran and Armon, Inc. violated the False

Claims Act ("FCA"), 31 U.S.C. §3129 *et seq.*, by submitting false claims in connection with two

federally funded construction projects. For the reasons stated below, defendants' motion for

summary judgment is granted in part and denied in part, and plaintiff's motion for partial

summary judgment is denied.

## PROCEDURAL HISTORY

King filed her original complaint on June 26, 2000 and an amended complaint on January

26, 2001. The amended complaint alleged that defendants Moran, Armon, Thermodyne, Jadco

and Arnold Jackson violated the FCA by fraudulently using Jadco, a minority owned business

enterprise ("MBE"), as a "pass through" for federal contract work actually performed by non-

MBEs. In or about March 2002, King voluntarily dismissed her claims against Jadco and



Jackson and settled her three claims against Moran and Armon relating to her employment with Moran. King's claims against Thermodyne were dismissed in May 2002.

During the course of discovery, the evidence apparently revealed that King did not have a viable FCA claim against Moran and Armon based on Moran's relationship with Jadco, and King has abandoned those allegations. Instead, King revised her position - but not her complaint - to allege FCA violations relating to Moran's subcontracting work with four different MBE companies: Air Lopez, Air Lopez Spiral, Ortiz Mechanical and JN Construction and Engineering. According to King, these four companies were improperly identified as MBE participants on two federal projects: the United States Post Office Main Facility project and the Chicago Job Corps project. King did not identify either the four MBEs or the two projects in her complaint or amended complaint.

## FACTUAL BACKGROUND

Moran, a wholly-owned subsidiary of Armon, performs heating, ventilation, and air conditioning ("HVAC") work on commercial and industrial buildings. King worked for Moran as an estimating support person from June 1998 until February 2000. She took on additional responsibility as Moran's EEO Officer beginning on April 6, 1999.

### A. The Post Office Main Facility Project

In 1991, some seven years before King was employed by Moran, the company was the successful bidder to provide HVAC subcontract work for the construction of the United States Post Office Main Facility in Chicago. The general contractor was a joint venture between the George Hyman Construction Company and the Power Contracting and Engineering Corporation ("Hyman Power"). Moran's subcontract with Hyman Power required Moran to provide

2

"qualified Minority Business Enterprise Participation in the amount of ten percent (10%) of the subcontract price," Pl. Facts ¶18, and to submit an MBE subcontracting plan "to encourage the participation of small, minority-owned, and woman-owned businesses." PX. H. The subcontract stated that failure to comply in good faith with these requirements "will be a material breach of contract," but it did not expressly condition payment for work upon Moran's actual achievement of the stated level of MBE participation. Pl. Facts ¶¶21, 53; Def. Resp. to Pl. Facts ¶¶21, 53.

The Postal Service retained The Target Group Inc. to serve as its Affirmative Action Consultant/Officer on the Post Office project. Pl. Facts ¶31. Moran's project manager, Chip Heinemann, understood that the Target Group was going to be the "watch dog group" to ensure that the MBE goals were being met, and that Moran needed to hire subcontractors that were "true contractors." Id. ¶34. On August 5, 1992, another Moran project manager, Terry Smith, met with the Postal Service's project manager and representatives from the Target Group to discuss, among other things, the fact that Moran still had not submitted an MBE subcontracting plan or given any subcontract work to any MBEs. Id. ¶40.

On September 16, 1992, Hyman Power sent Moran and other first tier subcontractors a memorandum listing "required documents for submittal on USPS Mail Facility" and enclosing copies of the form A-100 "M/WBE/SBE Contract Award Affidavit," the form E-100 "M/W/SBE Status Report" and the form B-100 "Subcontracting Plan." Id. ¶43. Shortly thereafter on October 26, 1992, Hyman Power's Senior Project Manager, Stephen Maslen, sent Terry Smith a letter instructing him that Moran was required to submit a subcontracting plan by October 30, 1992 and to submit E-100 forms on a monthly basis. Id. ¶44. Maslen conceded that the delay in submitting the subcontracting plan could be attributed to "incomplete purchasing or the fact that

many sub-sub deals are made from approved shop drawings." PX. D (CN0057); Def. Resp. to Pl. Facts ¶59.

On January 4, 1993, Hyman Power's Senior Vice President Wilson Shook sent Smith and other first tier subcontractors a letter requesting them to submit their subcontracting plans no later than January 15, 1993. Shook indicated that Hyman Power was "under increasing pressure to provide specific information to support the achievement of the MBE/WBE goals present in the prime contract," and he advised that "failing to comply will be looked upon with great disfavor." Pl. Facts ¶45. Shook did not specifically state, however, that either Hyman Power or the Postal Service would withhold payment if the subcontractors did not comply. Def. Resp. to Pl. Facts ¶45.

On January 13, 1993, Moran submitted its subcontracting plan indicating an MBE goal amount of $1.8 million. Pl. Facts ¶46. The plan stated that the project required bonding so "it is very unlikely that small businesses will be able to qualify." PX G, Ex. 9. By letter dated April 27, 1993, Maslen advised Heinemann that Hyman Power had not received "any confirmation [from Moran] of your commitment with regards to minority and women's business participation." Pl. Facts ¶49; PX D, CN106. Maslen further stated that "it is time to put some meat on the bone as we are starting to take some heat from the Postal Service on our meeting our contractual goal." *Id.*

In June 1993, Heinemann left Moran, and Darryl Delcase became project manager for the Post Office project. Pl. Facts ¶¶61-63. Almost a year later, on March 3, 1994, Hyman Power sent Delcase a letter stating that Moran was still falling short of its MBE subcontract commitment, which "could impede timely payments against your subcontract." *Id.* ¶52; PX M,

Ex. 8. On June 15, 1994, Delcase submitted to the Target Group an A-100 MBE/WBE Contract Award Affidavit in which he certified that "the MBE/WBE firms listed below are contracted to furnish or will furnish the goods and services indicated; that the goods and services will be provided for the value indicated; and that this is a complete and accurate description of the work to be performed or goods to be provided by such MBE/WBE firms to date." *Id.* ¶68; PX M, Ex. 18. Delcase identified Air Lopez, Air Lopez Spiral and Ortiz Mechanical as MBE firms which had subcontracts with Moran. *Id.* ¶69. It turned out that Air Lopez Spiral was never officially certified as an MBE, though Moran claims that it is 51% minority-owned. *Id.* ¶72; Def. Facts ¶91.

### 1. Moran's Subcontracts with Air Lopez

On October 7, 1993, Moran invited non-MBE contractor Commercial Industrial Insulation to bid for insulation work in connection with the Post Office project. Pl. Facts ¶95. Commercial submitted its bid on November 15, 1993, which included a commitment to 25% MBE participation. Pl. Facts ¶96; PX S, Ex. D. Moran and Commercial agreed, on some unknown date thereafter, that Commercial would provide insulation in the amount of $600,000. Pl. Facts ¶98. Moran claims that it subsequently canceled that agreement. Def. Resp. to Pl. Facts ¶98.

On April 20, 1994, Moran issued to Commercial a subcontract for insulation work valued at $86,334. The subcontract stated that "[a] new subcontract will be issued through Air Lopez, Inc. in the amount of $513,666 for a total of $600,000, as per our agreement." Pl. Facts ¶99. On June 6, 1994, Moran issued to Air Lopez a subcontract for insulation work in the amount of $513,666. *Id.* ¶110. Air Lopez, in turn, entered into a subcontract with Commercial pursuant to

5

which Commercial performed $513,666 of insulation work. Commercial submitted its invoices

to Air Lopez, with copies to Moran, and Air Lopez prepared invoices in the value of

Commercial's work and submitted them to Moran. Moran then issued joint checks to

Commercial and Air Lopez for the work, which Air Lopez endorsed over to Commercial. *Id.*

¶¶101, 125-26. Air Lopez received a 1% fee from Moran in connection with the Commercial

subcontract. *Id.* ¶127. The parties dispute whether this type of subcontracting arrangement is

common or proper.

On February 5, 1994, Moran issued to Air Lopez another subcontract valued at $153,000

to install ductwork. *Id.* ¶142. Though Moran had its own sheet metal workers to perform the

work, Moran wanted to receive MBE credit for it. *Id.* ¶145. According to King, Air Lopez had

no sheet metal workers available to perform the ductwork, so it "borrowed" Moran's employees.

*Id.* ¶¶146-50. Moran claims that Air Lopez hired the sheet metal workers through the Sheet

Metal Workers union hiring hall, which it says is normal practice in the HVAC construction

industry. Moran's general superintendent and general foreman supervised the workers, but Air

Lopez paid them through its payroll and paid all the union benefits. *Id.* ¶153; Def. Facts ¶¶81-83,

100-01.

### 2.    Moran's Subcontract with Ortiz Mechanical

On April 5, 1994, Moran issued to Ortiz Mechanical a subcontract on the Post Office

project requiring it to purchase a cooling tower and "set" consisting of an energy miser fan motor

system. Pl. Facts ¶¶158-59. The terms of the purchase of the cooling tower had been previously

arranged by Moran, and Ortiz incorporated those terms into its price quote to Moran. *Id.* ¶160.

Moran let Ortiz purchase the equipment rather than handling the purchase itself so that it could

claim MBE participation credit. *Id.* ¶165. In addition to providing and installing equipment for the Post Office project, Ortiz also provided labor for pipefitting work. Def. Facts ¶123. Ortiz received a 15% mark-up on the Post Office project, which is its standard overhead and profit. *Id.* ¶¶124-25.

## B.    The Chicago Job Corps Project

On May 2, 1997, Moran entered into a $2,250,000 contract with Blinderman Construction Company to provide HVAC work on construction of a Chicago Job Corps Center on behalf of the U.S. Department of Labor ("DOL"). As the general contractor on the project, Blinderman signed a contract with the DOL and understood its obligation to submit a subcontracting plan "[i]n accordance with FAR [Federal Acquisition Regulation] 19, Subpart 19.7 Subcontracting with Small Business, Small Disadvantaged Business and Women-Owned Small Business Concerns." Pl. Facts ¶¶169, 173-74. For its part, Moran committed to a 25% MBE participation goal on the HVAC work. *Id.* ¶176. Blinderman's on-site manager Dave Talbot told Moran's operations manager Karl Miller that the MBE goal was a requirement, and Miller understood that if the requirement was not met, Blinderman would "hold" Moran's payments. *Id.* ¶186. Talbot also warned Miller "to be careful with the use of a storefront" to meet MBE requirements. A "storefront" is "someone who passes paper . . . in order to meet a minority requirement." *Id.* ¶187.

Prior to bidding on the HVAC work, Moran invited a manufacturer's representative known as Fleming Hanson Sales to submit a price quotation for a variety of HVAC-related equipment that Moran would need for the job. Moran's bid included Fleming Hanson's pricing information. Pl. Facts ¶219. On May 20, 1997, Moran issued two purchase orders totaling

$320,000 to Fleming Hanson to furnish HVAC-related equipment for the Job Corps project. On June 3, 1997, Moran issued a subcontract to Commercial Industrial Insulation to furnish insulation work valued at $110,000. *Id.* ¶¶220-21. On November 10, 1997, Moran canceled the Fleming Hanson purchase orders and Commercial subcontract. That same day, Moran issued two purchase orders totaling $338,000 and a subcontract for insulation work in the amount of $112,750 to minority-owned JN Construction Company. *Id.* ¶¶222-23, 226. Commercial then became a subcontractor to JN on the insulation work and was paid by Moran with checks jointly payable to Commercial and JN. *Id.* ¶247. With respect to the two purchase orders, Moran satisfied its obligations to JN by paying it $8,000. *Id.* ¶¶248-49. According to King, JN received a 2.5% fee in exchange for forwarding the invoices of Fleming Hanson and Commercial to Moran. *Id.* ¶224.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, we view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). When cross motions are filed, we apply the same standard to each motion. *Stimsonite Corp. v. NightLine Markers, Inc.,* 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999).

8

## A. Subject Matter Jurisdiction

The FCA is intended "to encourage any individual knowing of Government fraud to bring that information forward." *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 858 (7th Cir. 1999). The Act includes a *qui tam* provision, which allows a private party or "relator" to bring a lawsuit alleging fraud upon the government and receive a percentage of any recovery. *Id.* at 857. In 1986, Congress amended the Act "to resolve the tension between . . . encouraging people to come forward with information and . . . preventing parasitic lawsuits." *Id.* (quoting *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 (11th Cir. 1994)). To that end, Congress established a jurisdictional bar against certain actions:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. §3730(e)(4). This jurisdictional bar "is not to be excessively narrowly construed," and should be evaluated within the context of Congress's intent to increase incentives for the exposure of fraud. *Mathews*, 166 F.3d at 858.

The inquiry into whether a court may hear a *qui tam* relator's claim has three parts: (1) Have the allegations made by the plaintiff been "publicly disclosed"? (2) If so, is the lawsuit "based upon" that publicly disclosed information? (3) If so, is the plaintiff an "original source" of the information? *Mathews*, 166 F.3d at 859. Defendants argue that King cannot pursue her FCA claim because the relevant allegations were publicly disclosed and King was not the original source of the information.

## 1. Public Disclosure Regarding the Post Office Facility Project

The public disclosure bar is aimed at determining whether a false claim was brought to the attention of government authorities before the relator brought suit. "[D]isclosure to a public official with direct responsibility for the claim in question of allegations or transactions upon which a qui tam claim is based constitutes public disclosure within the meaning of §3730([e])(4)." *Mathews*, 166 F.3d at 861. The public official "must be one whose duties extend to the claim in question in some significant way." *Id.* Defendants claim that the information giving rise to King's fraud allegations relating to the Post Office project was publicly disclosed in three ways: (1) in documents submitted to the Target Group; (2) during an Office of Federal Contract Compliance Program ("OFCCP") investigation of Moran's EEO practices; and (3) within a United States Department of Labor ("DOL") and OFCCP response to a Freedom of Information Act ("FOIA") request.

### a. Disclosure to the Target Group and the OFCCP

Defendants argue that the information giving rise to King's Post Office Facility project claim was disclosed to the Target Group, which acted on behalf of the Post Office to ensure that MBE goals were being met, and to the OFCCP during an audit conducted in connection with the Post Office project. Def. Mem., p. 5. Specifically, the Target Group received Moran's E-100 forms identifying the MBE subcontractors it was using on the Post Office project, and conducted audits of those subcontracts and purchase orders. The OFCCP likewise obtained subcontracts and purchase orders for work performed by Air Lopez, Air Lopez Spiral and Ortiz Mechanical. King counters that both the Target Group and the OFCCP only received the false information supplied by Moran and not the true facts about the work being performed by the MBEs, which

10

does not amount to a "public disclosure" under the FCA. Pl. Resp., p. 13 (citing *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994) (requiring disclosure of both misrepresented and true state of facts)).

The evidence submitted by the parties indicates that the Target Group did rely entirely upon the information submitted by Moran and Hyman Power in conducting its audits. This is significant because there is no evidence that the Target Group had access to information regarding Moran's arrangements with non-MBE contractors, without which the alleged "pass through" scheme would not have been readily discernible. Def. Facts ¶¶65, 67. On these facts, it cannot be said that the relevant information was disclosed to the Target Group.

The OFCCP file, on the other hand, does contain the purchase orders for the subcontracting work performed by Air Lopez and non-MBE contractor Commercial Industrial Insulation, and those purchase orders clearly reflect that the insulation subcontract was issued to Commercial "through" Air Lopez. DX 7. King disputes, however, that the disclosure of this information during an OFCCP investigation satisfies the requirement that disclosure be made to a public official "with direct responsibility for the claim in question." Moran finds it significant that the OFCCP reviewed its MBE documents and did not issue any citations, fines or penalties. Def. Mem., p. 5. But the OFCCP's investigation appears to have focused on Moran's compliance with equal employment goals, not MBE participation. PX HH, DOL61-63. In any event, defendants have presented no evidence that the OFCCP had direct responsibility for compliance with MBE goals or the authority to evaluate the legitimacy of Moran's MBE practices, much less issue citations or fines in that regard. *See* 41 C.F.R. §60-1.1, 60-1.2; *Dees v. California State University, Hayward*, 33 F. Supp. 2d 1190, 1197 (N.D. Cal. 1998) ("[t]he

OFCCP is an arm of the DOL responsible for ensuring compliance by federal government contractors with certain equal employment opportunity requirements"). Nor have they submitted evidence as to the potential consequence of a negative audit.

In sum, the Court cannot conclude that the disclosure of certain information to the Target Group or the OFCCP constituted "public disclosure" within the meaning of §3730(e)(4).

**b.    Disclosure in the FOIA Response**

Defendants next argue that public disclosure occurred when the OFCCP responded to Moran's January 9, 2002 FOIA request. Def. Mem., p. 6. The Seventh Circuit has not directly addressed whether the disclosure of documents under FOIA constitutes a public disclosure for purposes of §3730(e)(4). We believe, however, that the court would agree that public disclosure occurs upon actual receipt of information produced in response to a FOIA request. *See United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 979 (E.D. Wis. 1998) (public disclosure upon receipt of information pursuant to FOIA request), *aff'd*, 168 F.3d 1013 (7th Cir. 1999). *See also United States ex rel. Burns v. A.D. Roe Company*, 186 F.3d 717, 723 (6th Cir. 1999) (same). *But see United States ex rel. Eberhardt v. Integrated Design & Construction, Inc.*, 167 F.3d 861, 870 (4th Cir. 1999) (FOIA information is not a public disclosure because it is not specifically listed in §3730(e)(4)(A)).

Our inquiry does not end there, however, because the FOIA disclosure was made directly to Moran after King filed this lawsuit and during the course of discovery. Pl. Resp., p. 13 n.9 (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992) (disclosure during discovery is not public disclosure for purposes of the jurisdictional bar)). Moran asserts that the FOIA response is nonetheless a public disclosure because it occurred before King abandoned her

12

original theory of the case and adopted her new theory relating to Air Lopez, Air Lopez Spiral and Ortiz Mechanical. Def. Reply, p. 12.

If King's only knowledge of the Post Office project came from the FOIA response, then it arguably would be improper to allow her to avoid the jurisdictional bar simply by virtue of having filed an earlier - and apparently unfounded - FCA claim. It is clear that King never performed any work on the Post Office project, which was completed before she was even hired by Moran, and that she learned about it during the course of discovery in this case – otherwise it is safe to assume that she would have included those allegations in her original complaint. At the same time, a defendant should not be allowed to assert the jurisdictional bar by making a FOIA request after a *qui tam* action has been filed and then claiming that the information giving rise to the plaintiff's allegations have been publicly disclosed. The question the Court must address is whether King's knowledge of the Post Office project was based on the OFCCP's FOIA response, which her attorney received in April 2002.

King claims that she notified Moran about the alleged fraud involving the Post Office project in her June 2000 complaint, long before Moran even made the FOIA request. Pl. Resp., p. 14. However, King's allegation that the U.S. Postal Service and other agencies "funded . . . the contracts against which various defendants submitted their false claims" hardly amounts to a claim of fraud in connection with the Post Office Main Facility. Complaint ¶9. On the other hand, King submitted a settlement letter dated August 1, 2001 which clearly notified Moran of the Post Office project claim. Pl. Supp. Ex. AAA. In addition, King disclosed this claim in interrogatory responses dated March 1, 2002. Pl. Supp. Ex. BBB. Since Moran's attorney did not forward the FOIA documents to King's attorney until April 2002, Pl. Facts ¶300, King

clearly knew about the Post Office project claim from another source (presumably documents obtained during discovery), and not solely from Moran's FOIA request. This is significant because documents produced during discovery are not generally considered public disclosures within the meaning of §3730(e)(4). *See Mathews*, 166 F.3d at 860 ("discovery material which has not been filed with the court and is only theoretically available upon the public's request is not publicly disclosed within the meaning of §3730(e)(4)(A)") (internal quotations omitted). Accordingly, Moran will not be permitted to assert the FCA's jurisdictional bar based on its decision to make a FOIA request during the course of discovery.

Having concluded that none of the relevant information regarding the Post Office was publicly disclosed for purposes of §3730(e)(4), the Court need not reach the remaining two questions relating to jurisdiction; i.e., whether the information was "based upon" publicly disclosed information and, if so, whether King was an "original source" of the information. *See Mathews*, 166 F.3d at 859 ("[t]he threshold inquiry is whether there has been a public disclosure").

## B.   Federal Contracting and Funding

This leaves one issue for the Court to consider before turning to the merits of King's allegations. Defendants argue that summary judgment should be granted in their favor because neither Armon nor Moran had a direct contractual relationship with the government or received any federal funds. Def. Resp., pp. 4-5. The Court disagrees. The FCA "reach[es] any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943); 31 U.S.C. §3729(a)(2). In

this case, Moran had contracts with, and was paid by general contractors who, in turn, were paid by the federal government. *See Marcus*, 317 U.S. at 542-43 (FCA applied where "[a] large portion of the money paid the respondents under these contracts was federal in origin"); *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001) (quoting 31 U.S.C. §3729(c)) (FCA covers "any request or demand, whether under a contract or otherwise, for money or property . . . if the United States Government provides any portion of the money or property which is requested or demanded").

With respect to Armon, the parties present conflicting evidence as to the company's involvement with Moran's subcontracts on the Post Office and Job Corps projects. According to King, Armon's accounts payable department processed Moran's billing and accounts payable, signed check requests, and provided the numbers and information that Moran's assistant treasurer, Michael Cartier, used to prepare Moran's (1) E-100 forms for the Post Office project and (2) sworn statements submitted for payment on the Chicago Job Corps project which identified Moran's subcontractors and the amounts they would be receiving for their materials or labor. Pl. Facts ¶¶301, 306. Defendants claim that Moran has its own accounts payable department which processed billing and accounts payable, and that Moran alone supplied the information for the E-100 forms and sworn statements. Def. Resp. to Pl. Facts ¶¶301, 306. Neither party adequately developed this argument in the briefs, and on the facts before the Court, we cannot conclude that Armon should be dismissed from the case.

**C.     The Merits of King's FCA Claims**

King claims that Moran defrauded the government by funneling almost two million dollars of work through Air Lopez, Air Lopez Spiral, Ortiz Mechanical and JN Construction to

obtain MBE credit for work that was actually performed by non-MBEs. Pl. Mem., p. 21. King

asserts two theories of liability in this case: (1) Moran's knowing submission of false statements

to get paid on government projects in violation of §3729(a)(2); and (2) Moran's implied

certification that it was adhering to contract terms in violation of §3729(a)(1). Pl. Resp., pp. 4-5.

The Court addresses each in turn.

### 1. False Statements

To prove a claim under §3729(a)(2), King must show that (1) Moran made a record or

statement in order to get the government to pay money; (2) the record or statement was false or

fraudulent; and (3) Moran knew it was false or fraudulent. *United States ex rel. Lamers v. City of

Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). Not surprisingly, the parties vehemently dispute

whether Moran submitted false statements to the government on the Post Office and Chicago Job

Corps projects. With the exception of Air Lopez Spiral, it is undisputed that Moran worked with

certified minority contractors, namely, Air Lopez, Ortiz Mechanical and JN Construction. And it

appears that Moran had at least a good faith belief that Air Lopez Spiral was a certified MBE

since it was owned by the same person who owns Air Lopez. Thus, the real debate surrounds the

significance of Moran's contractual maneuvering to obtain MBE participation credit. Genuine

issues of fact preclude us from granting summary judgment in either party's favor on the issue of

whether Moran made false statements.

King challenges several of Moran's MBE contracts as being "pass through" schemes.

Specifically, Moran issued subcontracts to non-minority companies to perform certain work, then

canceled those subcontracts and reissued them to MBE firms which, in turn, subcontracted the

work back to the original non-minority companies on essentially the same terms. In exchange,

the MBEs received a certain percentage fee. It is not clear whether such an arrangement is valid for purposes of meeting MBE participation goals. The same may be said of Moran's subcontract with Air Lopez for insulation work, in which Air Lopez is claimed to have had to "borrow" employees (either from Moran or other companies) to perform the work. In all cases, Moran received MBE participation credit based on its representations that it had awarded subcontract work to MBEs. For example, Moran submitted E-100 and A-100 forms for the Post Office project stating that it had awarded a certain dollar value of work to MBEs. Similarly, Moran submitted sworn statements on the Job Corps project identifying its subcontractors and the amounts they would be receiving for their materials or labor. Pl. Facts ¶263. According to King, none of the forms reflected the actual amount the MBEs were ultimately paid for their work.

Moran argues that these statements were not false because it did not know that they were false. Def. Mem., pp. 20-21. *See Lamers*, 168 F.3d at 1018 ("it is impossible to meaningfully discuss falsity without implicating the knowledge requirement"). But this, too, raises a genuine issue of fact for a jury to decide. Under the statute, a person acts "knowingly" if he or she acts with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b); *Lamers*, 168 F.3d at 1018; *United States ex rel. Augustine v. Century Health Services, Inc.*, 289 F.3d 409, 413 (6th Cir. 2002). King has submitted evidence that Moran may have intentionally misled the government regarding the value of work being performed by the MBEs because it knew that the actual amounts paid to the MBEs were different from what it stated on the forms.

For example, on its a-100 MBE/WBE Contract Award Affidavit for the Post Office project, Moran stated that it had awarded Air Lopez insulation work valued at $513,666. But Air

Lopez was ultimately paid only 1% of the contract value as a fee. On the Chicago Job Corps project, Moran's minority plan indicated that JN Construction had contracts valued at $440,750, but it was ultimately paid only a small percentage fee after subcontracting out the actual work to non-MBEs. A jury could reasonably conclude that Moran knew what Air Lopez and JN were actually being paid and knew the companies were effectively nothing more than "pass throughs" and, therefore, misstated the value of the work awarded to those companies. Nor can we say as a matter of law that Moran's representations were merely "innocent mistakes" or "imprecise statements . . . growing out of a disputed legal question." *See Hindo v. University of Health Sciences/The Chicago Medical School*, 65 F.3d 608, 613 (7th Cir. 1995); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477-78 (9th Cir. 1996). There is evidence that Moran was specifically told to use "true contractors" and not "storefront" companies that only passed paper in order to meet the MBE goals established for the projects.

Moran next argues that its statements regarding MBE participation were immaterial regardless of their truth because the company was paid for all of its work even though it never attained its MBE goals. Def. Reply, p. 3. The real question, however, is whether Moran would have been paid or even allowed to keep its contracts with Hyman Power and Blinderman if the general contractors had known that Moran's effort to award minority subcontracts was (arguably) a sham.[1] *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999) (suggesting that an omission must be "material to the United States' buying decision" to support

---

[1]     The Court rejects Moran's argument that it should prevail because mandatory MBE requirements in public contracts are unconstitutional. The evidence presented to the Court is suggestive not of a mandatory MBE percentage for contractors but, rather, MBE goals plus a requirement that contractors make good faith efforts to achieve those goals. Moran has not shown that such an arrangement would be unconstitutional.

18

liability under the FCA). *See also United States v. Southland Management Corp.*, 288 F.3d 665, 676 (5th Cir. 2002) (noting split of authority as to whether FCA requires a showing of "outcome materiality"; i.e., a false statement that affects the government's ultimate decision whether to remit funds, or "claim materiality"; i.e., a false statement that is material to the defendant's claim of right). Neither party has submitted evidence that definitively resolves this point.

The record does indicate, however, that both Hyman Power and Blinderman considered Moran's MBE commitment to be a significant aspect of their contracts because the general contractors were themselves obligated to the federal government to ensure that minority businesses had the opportunity to participate in the projects. Hyman Power repeatedly notified Moran that it was required to submit an MBE subcontracting plan and act in good faith to meet its stated MBE goals. Moran's subcontract expressly stated that failure to comply in good faith with these requirements "will be a material breach of contract." Similarly, Blinderman told Moran that the MBE goal in its contract was a "requirement." Hyman Power told Moran that any MBEs had to be "true contractors," and Blinderman warned Moran against the use of "storefront" MBEs that simply "pass paper." Under the circumstances, the Court cannot say as a matter of law that Moran would have maintained its subcontracts with Hyman Power and Blinderman and would have been paid no matter whether or how it attempted to meet its MBE goals. *See, e.g., United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (the FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government").

Nor do we find merit to Moran's assertion that the government was not harmed by its allegedly false statements. The mere fact that the government chose not to intervene in this

action in no way demonstrates that it did not consider Moran's statements to be false, or that it "received exactly what it paid for in all projects performed by Moran." Def. Mem., p. 23. If it did, the statutory provisions allowing relators to pursue fraud actions would be superfluous; indeed, a "private party may not conduct the action unless the government decides not to intervene." *Khan v. Chicago Housing Authority*, No. 01 C 976, 2002 WL 849801, at *2 (N.D. Ill. May 3, 2002). The government clearly expected its contractors to meet the MBE goals as set forth in the general contracts, and these obligations applied to Moran as a subcontractor. *See, e.g.,* PX M, Ex. 8 ("Again, we emphasize the fact that [the MBE subcontract commitment in] your subcontract agreement is an obligation which Hyman/Power has passed on to the United States Postal Service. Be informed that failure to meet your commitment could impede timely payments against your subcontract"). If Moran set up a scheme to get around the government's MBE requirements, the government was harmed in that it paid Moran even though its MBE program was being undermined.

In sum, neither party has demonstrated that it is entitled to prevail on King's false statements theory as a matter of law, and summary judgment is denied as to both.

### 2. Implied Certification

King next argues that Moran is liable under the FCA because it impliedly made a false certification that it was complying with its contractual obligations[2] regarding MBE subcontracting. Under this so-called implied certification theory,[2] "[a] contractor who knowingly

---

[2]       The Court rejects Moran's suggestion that the implied certification theory is not valid under the FCA. Moran's cited cases merely rejected the theory as applied to the particular facts presented; they did not say that the theory was an invalid one. *See Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1044 (N.D. Ill. 1998) (rejecting implied certification claim where the defendant's "compliance with any statutes or regulations was [not] a material

fails to perform a material requirement of its contract . . . yet seeks or receives payment without disclosing the nonperformance, has presented a false claim to the government and may be liable therefor." *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 627 (W.D. Wis. 1995). To succeed under this theory, a plaintiff must show that compliance with the relevant statutes and regulations was a condition of receiving payment. *See, e.g., United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266-68 (9th Cir. 1996); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (false certifications of compliance with the Medicare anti-kickback and anti-self-referral statutes). *See also Augustine*, 289 F.3d at 413-14; *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 531-32 (10th Cir. 2000); *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995).

Moran claims that its contracts were not governed by any federal statutes or regulations as required for an implied certification theory. Def. Reply, pp. 3-6. According to Moran, its subcontracts with Hyman Power and Blinderman do not identify any regulation or statutory provision requiring MBE participation. Nor do they reference the Small Disadvantaged Business Act, the 8(a) or 8(d) programs, any "Statement of Cooperation" or any other federal provision. Def. Mem., p. 17. King responds that Moran's subcontract with Hyman Power incorporated by reference Hyman Power's general contract with the Postal Service. The terms of that general contract "were dictated by the Postal Service's Procurement Manual" which, in turn, includes

---

condition to receiving payment from the government"); *United States v. Shaw*, 725 F. Supp. 896 (S.D. Miss. 1989) (rejecting implied certification theory on the particular facts of the case); *United States ex rel. Berge v. Board of Trustees of the University of Alabama*, 104 F.3d 1453, 1461 (4th Cir. 1997) (rejecting false certification claim based on omission of information that the defendant was under no obligation to disclose).

procedures for contracting with minority-owned businesses. Pl. Reply, pp. 3-4; 39 C.F.R. §601.103.

With respect to the Job Corps project, King argues that Moran's subcontract was governed by the Federal Acquisition Regulations ("FAR") because (1) federal regulations are generally incorporated by reference into contracts; (2) Moran's assistant treasurer, Michael Cartier, read and signed a document regarding Moran's equal employment obligations which stated that FAR 52.222-27, Affirmative Action Compliance Requirements for Construction, was incorporated in the subcontract; and (3) Moran's subcontract with Blinderman incorporated by reference the terms of the general contract with the DOL, which required performance in accordance with certain "standard clauses attached hereto from the FAR, Part 52." Pl. Reply, pp. 5-6. The referenced clauses do not include specific requirements regarding minority contracting.

The Court is not convinced that Moran certified its compliance with any of the above regulations. In submitting the E-100 and A-100 forms for the Post Office project, Moran certified that the MBE subcontracting information was accurate, but the forms do not reference any particular statute or regulation. The same is true of the waivers of lien supplied on behalf of JN Construction in order to receive payment on the Chicago Job Corps project and the sworn statements regarding Moran's subcontracts on that project. PX J, Exs. 41, 42. Moreover, the certification merely resulted in Moran obtaining MBE participation credit and was not a "claim for payment." *Compare Ab-Tech*, 31 Fed. Cl. at 433-34 (minority contractor violated FCA by submitting payment vouchers certifying that it was adhering to the requirements for participating in the Small Business Act's 8(a) program available only to qualifying minority businesses, because the SBA was at the heart of the parties' agreement). There is evidence that Moran's

22

payments could be withheld, suspended or "impeded" if it did not exercise good faith in trying to meet its MBE subcontracting goals or submit the required documentation. However, it is too big a leap to say that in those documents, Moran impliedly certified its compliance with federal regulations or statutes as a precondition to getting paid on the projects. *Compare Fallon*, 921 F. Supp. at 621 (denying summary judgment to contractor that submitted claims for payment on goods it knew had not been properly tested as required by government contract).

King has not presented genuine issues of fact as to her implied certification theory of liability, and the Court therefore grants summary judgment to defendants on this issue.

## D. The Requirement of Government Disclosure

Defendants raise one final argument which must be addressed; namely, that King failed to disclose her allegations relating to the Post Office and Chicago Job Corps projects to the government prior to filing her lawsuit. The FCA requires a plaintiff to serve upon the government a copy of her complaint and a "written disclosure of substantially all material evidence and information the person possesses." 31 U.S.C. §3730(b)(2). There is no question that King complied with this requirement prior to filing her complaint in June 2000. At that time, however, King made no mention of her claims relating to the Post Office and Chicago Job Corps projects. Defendants argue that King was required to disclose these new claims to the government before proceeding with her lawsuit. King asserts that she has not raised any new claims, per se, but has merely expanded the scope of Moran's fraudulent scheme.

The requirement that fraud allegations first be disclosed to the government serves two purposes: (1) to protect the interests of the government; and (2) to protect defendants from having to prepare a defense without knowing which party, the government or the individual

23

relator, will litigate the action. *See, e.g., United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998-99 (2d Cir. 1995). If the government declines to intervene in an action, it continues to receive all pleadings filed in the case and may intervene at a later date upon a showing of good cause. 31 U.S.C. §3730(c)(3); *United States ex rel. Mikes v. Straus*, 931 F. Supp. 248, 259 (S.D.N.Y. 1996).

For reasons which are not clear to this Court, King never amended her complaint to include the allegations regarding the Post Office and Chicago Job Corps projects. The government arguably did not have an adequate opportunity to decide whether to intervene, though we note that it received the parties' summary judgment papers, which extensively discuss those projects. And defendants were not prejudiced by the failure to amend, as they have known for quite some time the altered basis of King's claims and have been able to address the altered theories fully in discovery and on summary judgment. Under the circumstances, King's failure to amend does not justify an outright dismissal of her lawsuit; the requirements of §3730(b)(2) are procedural and not jurisdictional. *See Wisz ex rel. United States v. C/HCA Development, Inc.*, 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998); *Mikes*, 931 F. Supp. at 259. Nevertheless, King must amend her complaint to include the new allegations, keeping in mind the pleading requirements of Fed. R. Civ. P. 9(b), so that it is clear what the current basis of her claim is and so that the government has an adequate opportunity to intervene pursuant to §3730(c)(3).

Before King can be allowed to amend her complaint, however, we must consider whether such an amendment is barred by the FCA's statute of limitations. Under the Act, King was required to file her action "no more than (1) six years after the date on which the FCA violation is committed or (2) three years after the date when facts material to the right of action are known

or reasonably should have been known by [her], whichever occurs last." *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1218 (9th Cir. 1996); *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1008 (N.D. Ill. 2001); 31 U.S.C. §3731(b). In addition, "[a] suit under the Act must, in any event, be brought no more than ten years after the date on which the violation occurred." *Hyatt*, 91 F.3d at 1218; 31 U.S.C. §3731(b).

Moran argues that King cannot raise allegations of false claims for payment on the Post Office project arising prior to June 26, 1994 because the relevant information was disclosed to the government as of that date, and King filed her initial complaint six years later on June 26, 2000. Even if the Court agreed that the government knew or should have known about the allegations giving rise to the fraud – which it does not for the reasons discussed earlier – the government's knowledge is irrelevant because it decided not to intervene in King's action. *See United States ex rel. Bidani v. Lewis*, No. 97 C 6502, 1999 WL 163053, at *9 (N.D. Ill. Mar. 12, 1999) (absent government intervention, "the three-year knowledge rule is measured by the knowledge of the qui tam plaintiff"). The only relevant inquiry is when King herself learned of the information, which did not occur until sometime after she filed her June 28, 2000 complaint. Accordingly, King's amended complaint will not be barred by the statute of limitations so long as it is filed before June 28, 2003 and does not seek to recover for fraud occurring more than ten years prior to the filing date. In order to keep this case on track, however, we will direct King to file an amended complaint on or before August 30, 2002.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment [docket item 71-1] is granted in part and denied in part, and plaintiff's motion for partial summary judgment [docket item 80-1] is denied.  King has until August 30, 2002 to file an amended complaint.

MATTHEW F. KENNELLY
United States District Judge

Date:   August 22, 2002